UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 15-3637(DSD/DTS)

Brittany A. Karels,

    Plaintiff,

v.                                    **ORDER**

Gabriel A. Storz and
Samuel J. Norlin, acting
in their individual capacities
as officers of the Big Lake
Police Department,

    Defendants.

    Kathryn H. Bennett, Esq., Paul C. Dworak, Esq. and Gaskins Bennett Birrell Schupp, LLP, 333 South Seventh Street, Suite 3000, Minneapolis, MN 55402, counsel for plaintiff.

    Patrick S. Collins, Esq., Joseph E. Flynn, Esq. and Jardine, Logan & O'Brien, PLLP, 8519 Eagle Point Blvd., Suite 100, Lake Elmo, MN 55042, counsel for defendants.

This matter is before the court upon the motion for summary judgment by defendants Gabriel A. Storz and Samuel J. Norlin, acting in their individual capacities as officers of the Big Lake Police Department. Based on a review of the file, record, and proceedings herein, and for the following reasons, the court grants the motion in part.

**BACKGROUND**

This civil rights dispute arises out defendants' arrest of plaintiff Brittany A. Karels. Karels resides in Big Lake, Minnesota with her five-year old son and rents a room in the

residence of Robert and Jennifer Owens. Karels Dep. at 7:9-16, 56:12-20. On the evening of March 27, 2015, Karels returned home from work and Karels drank a six-pack of beer. Karels Dep. at 81:1-82:4. At 1:23 a.m., Karels texted Jennifer Owens and asked her to watch her son while she went out to purchase cigarettes. Owens refused because Karels had been drinking. Collins Aff. Ex. D; id. Ex. B at 3. Karels persisted in her requested, however, and Owens ultimately agreed to watch Karels's son. Collins Aff. Ex. B at 4. After purchasing cigarettes, Karels went to Chatter Bar in Monticello instead of returning home. Karels Dep. at 77:1-78:21, 144:8-19. While at the bar, Karels had two shots of liquor and, after the bar closed, smoked marijuana in the parking lot. Id. at 69:4-70:19, 77:1-78:21, 144:11-145:14. Jennifer Owens became concerned when Karels did not return and did not respond to text messages or phone calls. Id. at 146:12-22, 148:11-15; Collins Aff. Ex. B at 4.

Karels took a taxi home and, when she arrived, notified Owens that she had returned. Karels Dep. at 145:4-146:22; Collins Aff. Ex. B at 5. Owens and Karels then began loudly arguing outside the house. J. Owens Dep. at 37:1-18. The argument continued into the kitchen, where Robert Owens tried to get Karels to go to her room. Id. at 37:1-18, 38:9-25; Karels Dep. at 146:12-22. Karels refused, and Robert Owens called 9-1-1. Karels Dep. at 146:12-22; see Dworak Aff. Ex. D. Robert Owens later told police that he called

9-1-1 because he feared for his physical safety, but during the call he only mentioned that Karels was a "drunk that's being ignorant." Dworak Aff. Ex. D.; Collins Aff. Ex. E at 6, 17; R. Owens Dep. at 34:21-35:2, 84:1-12.

Defendants Norlin and Storz were dispatched to the scene. When they arrived, Karels and Jennifer Owens were still arguing. Karels Dep. at 152:11-153:4. Jennifer and Robert Owens told defendants that Karels had been drinking, was argumentative, and they wanted her to go to her room and leave them alone. R. Owens Dep. at 33:13-25; J. Owens Dep. at 48:9-13; Dworak Aff. Ex. E at 2. They told the officers that they did not feel threatened by Karels. Dworak Aff. Ex. E at 2.

Storz asked to speak with Karels privately, and they went outside so she could smoke a cigarette. Karels Dep. at 153:21-156:6; Collins Aff. Ex. G at 2. Once outside, Karels began cursing loudly, and Storz told her to lower her voice so she would not disturb the neighbors. Karels Dep. at 157:1-158:8; Collins Aff. Ex. G at 2. Karels eventually calmed down enough so that she could tell Storz her side of the story, after which they went back inside the house. Karels Dep. at 157:1-158:8; Collins Aff. Ex. G at 2.

Once inside, Storz asked Karels for her identification. Karels Dep. at 159:4-23; Collins Aff. Ex. G at 2; Dworak Aff. Ex. E at 2. Karels testified that she is unsure whether she complied with Storz's command the first time, but Jennifer Owens testified,

and defendants' incident reports indicate, that Karels had to be asked several times for her identification. Karels Dep. at 159:4-23; J. Owens Dep. at 115:22-117:4; Collins Aff. Ex. G at 2; Dworak Aff. Ex. E at 2. Karels eventually provided her ID to Storz. Karels testified that she calmly gave her ID to Storz. Karels Dep. at 162:16-163:1. Storz testified, however, that Karels approached him aggressively, thrust her ID towards him, and squared off her body with his, which he perceived to be a fighting stance. Storz Dep. at 55:5-14. Storz also testified that when Karels approached him, he put out his right hand and pointed his index finger, which she ran into, and told her either to "back off." Storz Dep. at 56:11-21. Karels claims that Storz poked her in the collarbone three to four times. Karels Dep. at 165:1-24, 172:18-25.

After being allegedly poked by Storz, Karels demanded to speak to defendants' supervising officer, but defendants responded that there was no supervising officer on duty. Karels Dep. at 167:19-168:10; Collins Aff. Ex. G at 2. Karels then went to the garage to smoke another cigarette, and Norlin followed while Storz stayed in the kitchen. Karels Dep. at 179:13-20; J. Owens Dep. at 59:16-60:20; Dworak Aff. Ex. E. at 3.

While in the garage, Karels twice called 9-1-1 to request a sergeant or Sherburne County Deputy. Karels Dep. at 175:24-178:12. According to the call transcripts, Karels told the dispatcher that Big Lake police would not leave her alone and had assaulted her.

4

Id.; Collins Aff. Ex. H. at 1. The dispatcher told Karels that she could file a complaint in the morning. Collins Aff. Ex. H. at 1. It is undisputed that Karels was yelling and cursing at the dispatcher during the two calls. Karels Dep. at 177:6-178:3.

During the second 9-1-1 call, dispatch radioed defendants, told them that Karels kept calling and making demands, and asked if they were going to arrest her. Norlin Dep. at 119:17-120:1; Dworak Aff. Ex. I. Storz informed Karels that she was under arrest, grasped her left wrist, and brought it behind her back.[1] Karels Dep. 183:18-185:23. At the same time, Karels tried to put out her lit cigarette, which was located in her right hand. Id. at 184:14-20. Karels testified that Norlin pulled her right arm towards an empty coffee can, and away from Storz, to put out the cigarette, but Norlin's incident report states that he took the lit cigarette from her hand and threw it on the floor. Id. at 184:14-20, 195:13-15; Dworak Aff. Ex. E at 4. In any case, Storz felt Karels pull away from him, and he commanded her to stop resisting arrest. Karels Dep. at 191:20-192:22.

After Norlin extinguished the cigarette, he grasped Karels's right hand and put it behind her back to be handcuffed. Karels

---

[1] It is unclear from the record whether Storz used his right hand, as claimed by defendants, or both of his hands, as claimed by Karels. It is also disputed whether Karels merely informed defendants she needed to put her cigarette out, or whether, when told she was under arrest, she stated that she was not going to do anything until she finished smoking. See Dworak Aff. Ex. E at 4; Karels Dep. at 190:22-191:3.

5

Dep. at 199:22-200:3; Dworak Aff. Ex. E at 4. At the same time, Storz moved Karels's hand to the midway point of her back and placed it in handcuffs. Karels Dep. at 209:14-24; Dworak Aff. Ex. E at 4.

The parties dispute what happened next. Defendants argue that Karels stepped forward while moving her right side up and forward and succeeded in escaping from Norlin's grip. Dworak Aff. Ex. E at 4. Karels then stepped forward again and fell forward towards the garage steps, landed on her left side, and hit her head on the door. Id.; Karels Dep. at 201:3-22. Storz maintained his grip on Karels but also lost balance and fell on the ground to the left of Karels. Id. at 205:22-206:1; Collins Aff. Ex. G at 4. Karels contends, however, that she did not pull away from Norlin[2] and that Storz body slammed her to the ground. Karels Dep. at 201:6-8, 206:23-207:22. Karels also states that she was not handcuffed until after she was slammed to the ground. Id. at 215:7-15. When Karels hit the ground, she experienced pain in her left arm. Id. at 218:9-11. While Karels was on the ground, Storz placed her in handcuffs. Collins Aff. Ex. G at 4. Storz and Norlin then assisted her to her feet and escorted her to the squad car. Id.;

---

[2] Karels testimony on this point appears to be inconsistent. Later in her testimony, Karels did not deny that she pulled out of Norlin's grasp. Karels Dep. at 200:4-9. For the purposes of this motion, the court will resolve any inconsistency in favor of Karels. Roberts v. Park Nicollet Health Servs., 528 F.3d 1123, 1126 (8th Cir. 2008).

Karels Dep. at 215:10-216:11.

While being escorted to the car, Karels complained about her arm numerous times. Norlin Dep. at 37:11-13, 39:22-40:9; J. Owens Dep. at 62:13-63:11; R. Owens Dep. at 42:23-43:12; Dworak Aff. Ex. E at 4. Storz searched Karels and found a small amount of marijuana and a marijuana pipe. Dworak Ex. E. at 4. Karels requested medical attention, and Norlin called an ambulance. Karels Dep. at 229:1-17; Dworak Aff. Ex. E at 5.

Karels told the paramedics that her arm was numb and felt dislocated. Collins Aff. Ex. L at 10-11. The paramedics attempted to examine her, but she refused to be touched and demanded to be taken to the hospital. Id. at 11. Norlin told Karels that she would go to jail if she did not let the paramedics treat her. Id. at 12. Karels continued to refuse care from the paramedics so Norlin took her to the Sherburne County jail. Id. at 12-13.

At the jail, Karels again complained that her left arm was numb. Collins Aff. Ex. R. She said that she was unable to put her hands on the wall as instructed because of left arm pain. Id.; Karels Dep. at 238:11-20, 246:21-247:6. Karels was then brought to Sergeant Mike DeMarre, a trained EMT, for booking. Karels again complained about her arm, and although she was initially reluctant to allow DeMarre to examine her, she eventually let him do so. Collins Aff. Ex. T; id. Ex. W. DeMarre felt a grinding in Karels's left arm, which is indicative of a broken bone. Id. Ex. T. He

7

placed her arm into a splint, and Norlin transported her to the hospital in Monticello. Id. At the hospital, Norlin cited Karels for disorderly conduct, obstruction without force, possession of marijuana, and possession of paraphernalia, all of which are misdemeanors. Norlin Dep. at 24:2-26:5.

An x-ray of her arm revealed that she had a spiral fracture of the humerus bone. Dworak Aff. Ex. J at 4. Karels was subsequently transported to St. Cloud hospital for emergency surgery.

On July 14, 2015, Karels pleaded guilty to disorderly conduct, and the remaining charges were dismissed. Collins Aff. Ex. AA. On September 10, 2015, Karels filed a complaint alleging claims under 42 U.S.C. § 1983 for (1) excessive use of force in violation of the Fourth Amendment and (2) deliberate indifference in denial of medical care in violation of the Fourth and Fourteenth Amendments.[3] Defendants now move for summary judgment.

## DISCUSSION

### I. Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

---

[3] Karels has withdrawn her excessive force claim against Norlin and her deliberate indifference claim under the Fourth Amendment.

8

A fact is material only when its resolution affects the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. See id. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient ....").

On a motion for summary judgment, the court views all evidence and inferences in a light most favorable to the nonmoving party. Id. at 255. The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings but must set forth specific facts sufficient to raise a genuine issue for trial. Celotex, 477 U.S. at 324. A party asserting that a genuine dispute exists – or cannot exist – about a material fact must cite "particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A). If a plaintiff cannot support each essential element of a claim, the court must grant summary judgment because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. Celotex, 477 U.S. at 322-23.

**II. Excessive Force**

**A. Fourth Amendment Violation**

Karels alleges that Storz violated her Fourth Amendment rights by using excessive force, namely, by slamming her to the ground during the arrest. The Fourth Amendment protects against the use of excessive force in the apprehension or detention of a person.

9

Graham v. Connor, 490 U.S. 386, 395 (1989). "To establish a constitutional violation under the Fourth Amendment's right to be free from excessive force, the test is whether the amount of force used was objectively reasonable under the particular circumstances." Brown v. City of Golden Valley, 574 F.3d 491, 496 (8th Cir. 2009) (citations and internal quotation marks omitted). "[T]he right to make an arrest ... necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Cook v. City of Bella Villa, 582 F.3d 840, 849 (8th Cir. 2009) (internal quotation marks omitted) (quoting Graham, 490 U.S. at 396).

When evaluating the reasonableness of an officer's use of force, the court considers "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. (citing Terry v. Ohio, 392 U.S. 1, 20-22 (1968)). The "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." Id. at 396-97; see

Brown, 574 F.3d at 496.

Here, viewing all facts in the light most favorable to Karels, a reasonable jury could find that Storz's use of force was unreasonable.  First, defendants responded to, and arrested Karels, for non-violent misdemeanor offenses.  Second, although Storz testified that Karels acted aggressively, the Owenses did not feel physically threatened by Karels.[4]  Additionally, Storz's use of force report states that he used force to "effect an arrest," not to protect himself or another.  See Dworak Aff. Ex L.  Third, there is a genuine dispute as to whether and, if so, to what degree Karels resisted arrest.  Even if Karels did resist arrest by pulling out of Norlin's grip, Storz's use of force may still have been unreasonable because a jury could find that Karels's resistance was de minimus and that Storz's use of force was disproportionate.  See Rohrbough v. Hall, 586 F.3d 582, 586 (8th Cir. 2009) (holding that the reasonableness of the officer's use of force, even when the suspect pushed the officer, was a question of fact for the jury).

**B.   Qualified Immunity**

Storz argues that even if there was a constitutional violation, he is immune from suit under the doctrine of qualified

---

[4] Although Robert Owens told police that he feared for his physical safety after the arrest took place, before the arrest, neither of the Owenses said that they feared for their safety.  See Dworak Aff. Ex. D.; id. Ex. E at 2; Collins Aff. Ex. E at 6, 17; R. Owens Dep. at 34:21-35:2, 84:1-12.

11

immunity. "The doctrine of qualified immunity protects [law enforcement] officers from personal liability under § 1983 insofar as their conduct does not violate clearly established ... constitutional rights of which a reasonable person would have known." Baribeau v. City of Minneapolis, 596 F.3d 465, 473 (8th Cir. 2010) (alteration in original) (citation and internal quotation marks omitted). The court applies the doctrine of qualified immunity in a manner that "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." Walker v. City of Pine Bluff, 414 F.3d 989, 992 (8th Cir. 2005) (internal quotation marks omitted) (quoting Hunter v. Bryant, 502 U.S. 224, 229 (1991)).

To determine whether the officers are entitled to qualified immunity, the court first considers whether the alleged facts demonstrate that their conduct violated a constitutional right and, if so, whether the right claimed was clearly established at the time of the alleged injury. Howard v. Kan. City Police Dep't, 570 F.3d 984, 988 (8th Cir. 2009). "If the answer to either question is no," then the officers are entitled to qualified immunity. Doe v. Flaherty, 623 F.3d 577, 583 (8th Cir. 2010). "A defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shows would have understood that he was violating it." Tatum v. Robinson, No. 16-1908, 2017 WL 2324709, at

12

*2 (8th Cir. May 30, 2017) (internal quotations marks omitted) (quoting Plumhoff v. Rickard, 134 S. Ct. 2012, 2023 (2014)). A court "must not define clearly established law at a high level of generality," id., but there need not be "a case directly on point." Id. (internal quotation marks omitted) (quoting White v. Pauly, 137 S. Ct. 548, 551 (2017)). "There is no requirement that the very action in question has previously been held unlawful, but rather, in the light of pre-existing law the unlawfulness must be apparent." Vaughn v. Ruoff, 253 F.3d 1124, 1129 (8th Cir. 2001) (internal quotation marks and citations omitted).

"The right to be free from excessive force in the context of an arrest is clearly established under the Fourth Amendment." Small v. McCrystal, 708 F.3d 997, 1005 (8th Cir. 2013). The use of a takedown maneuver on a "nonviolent, suspected misdemeanant who was not threatening anyone, was not actively resisting arrest, and was not attempting to flee" is a clearly established violation of the Fourth Amendment. Montoya v. City of Flandreau, 669 F.3d 867, 873 (8th Cir. 2012); see also Brown, 574 F.3d at 499 ("[I]t is clearly established that force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest and pose little or no threat to the security of the officers or the public.").

Storz argues that he is entitled to qualified immunity because Karels was resisting arrest and it is not clearly established that

the use of force on a resisting suspect violates the Fourth Amendment. But, as discussed above, there is a genuine issue as to whether and to what degree Karels was resisting arrest, and, if Karels did resist, whether Storz's use of force was reasonable. See Rohrbough, 586 F.3d at 586-87 (affirming the district court's denial of qualified immunity where a jury could determine that the officer's use of force was unreasonable even though the suspect pushed the officer). As a result, Storz is not entitled to qualified immunity, and summary judgment on the excessive force claim is not warranted.

**III. Deliberate Indifference to Medical Needs**

Karels claims that defendants violated her Fourteenth Amendment right to due process by showing deliberate indifference to her need for medical care.

A pre-trial detainee's claim of inadequate medical care arises under the Due Process Clause of the Fourteenth Amendment, but courts apply the deliberate-indifference standard of the Eighth Amendment. Krout v. Goemmer, 583 F.3d 557, 567 (8th Cir. 2009). To establish deliberate indifference, Karels must show that (1) she "suffered from one or more objectively serious medical needs," and (2) defendants "actually knew of, but deliberately disregarded, [Karels's] medical needs." Id. Under the second prong, Karels "must show that the officers recognized that a substantial risk of harm existed and knew that their conduct was inappropriate in light

14

of that risk." Id. (emphasis in original). "[D]eliberate indifference must be viewed from [defendants'] perspective at the time in question, not with hindsight's perfect vision." Jackson v. Everett, 140 F.3d 1149, 1152 (8th Cir. 1998). Karels must meet the "extremely high standard" of showing that defendants' mental state was more than grossly negligent. Saylor v. Nebraska, 812 F.3d 637, 644 (8th Cir. 2016).

It is undisputed that Karels's broken arm constitutes an objectively serious medical injury. Defendants argue, however, that they were not deliberately indifferent to her medical needs. The court agrees.

Viewing the events in question from the perspective of defendants, they were unaware of the extent of Karels's injury. Defendants knew that Karels had fallen on her left arm and that she was complaining of pain, but her unwillingness to allow the paramedics to examine her precluded them from learning more. Further, Karels cannot show that defendants were more than grossly negligent. Defendants did not ignore Karels's complaints of pain and requests for medical attention; rather, Norlin promptly, and appropriately, called an ambulance as Karels requested. Had Karels cooperated with the paramedics, she would have received immediate treatment for her broken arm. The delay in Karels's medical treatment was due to her own actions, not the actions of defendants. As a result, Karels cannot meet the high standard of

showing defendants were deliberately indifferent to her medical needs, and summary judgment on this claim is warranted.

**CONCLUSION**

Accordingly, based on the above, **IT IS HEREBY ORDERED** that defendants' motion for summary judgment [ECF No. 17] is granted in part as set forth above.

Dated: June 8, 2017

s/David S. Doty
David S. Doty, Judge
United States District Court